UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
AHMAD AL-KAYSEY,

                 Plaintiff,

    - against -

ENGILITY CORPORATION, GLOBAL
LINGUIST SOLUTIONS, and JOHN McHUGH,
Secretary of the Army,

                Defendants.
----------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
11-CV-6318 (RRM) (LB)

       Plaintiff Ahmad Al-Kaysey brings this action against defendants Engility Corporation[1]

("Engility"), Global Linguistic Solutions ("GLS"), and the Secretary of the Army ("Army"),

asserting claims of discrimination, retaliation, and hostile work environment arising out of his

employment as a linguist in Iraq. The Court presumes familiarity with the procedural history of

this case, including this Court's two previous Orders addressing earlier motions to dismiss.[2]

---

[1] Engility was formerly "L-3 Services, Inc." and is referred to as such in some previous documents by the parties
and the Court.

[2] The Court denied the Army's motion in its entirety, rejecting the Army's procedural challenges and finding that the
Army was not entitled to judgment on the pleadings. *Al-Kaysey v. L-3 Servs. Inc.* (*Al-Kaysey I*), No. 11-CV-6318
(RRM), 2013 WL 5447686, at *3–8 (E.D.N.Y. 2013). The Court considered the Army's motion for a judgment on
the pleadings based on Al-Kaysey's alleged failure to exhaust his administrative remedies under Title VII and the
Army's assertion that Al-Kaysey was not a federal employee and thus the Army could not be held liable as his
employer. *Id.* at *8. The Court rejected both arguments and found that Al-Kaysey had sufficiently plead that he was
an employee of the Army for Title VII purposes because he had "plausibly plead liability premised on a theory of
joint employment" – an issue that could not be resolved on a Rule 12 motion. *Id.* at *13. In a separate Order issued
the same day, the Court denied GLS's and Engility's motions to dismiss Al-Kaysey's Title VII claims, finding that
Al-Kaysey had plausibly plead that they were joint employers of the Army and, consequently, that the alleged Title
VII violations were attributable to Engility and GLS. *Al-Kaysey v. Engility, Inc.* (*Al-Kaysey II*), No. 11-CV-6318
(RRM), 2013 WL 5447830, at *3 (E.D.N.Y. 2013). The Court dismissed Al-Kaysey's Fifth Amendment Due
Process claims, finding that "the incident report concerning plaintiff filed on JPAS does not rise to the level of a
'stigma' cognizable under the Due Process Clause." *Id.* at *6.

In January 2014, the Army requested a second opportunity to move to dismiss, this time for lack of subject matter jurisdiction[3] – a request in which Engility and GLS subsequently joined.  (*See* 1/27/14 Army Ltr. (Doc. No. 73).)  The Court granted defendants leave to file motions to dismiss and Al-Kaysey, now represented by counsel, sought leave to file a motion to amend his *pro se* complaint at a pre-motion conference.  (3/13/14 Minute Entry (Doc. No. 84); Briefing Schedule (Doc. No. 87).)  Those motions are now before the Court.[4]  (*See* Army's Mot. to Dismiss (Doc. No. 90-1); Pl.'s Opp'n to Army & Mot. to Am. (Doc. No. 93); Army's Mot. to Dismiss Reply (Doc. No. 92); GLS Opp'n to Mot. to Am. (Doc. No. 95); Engility Opp'n to Mot. to Am. (Doc. No. 96); Pl.'s Reply Mem. in Further Supp. of Mot. to Am. (Doc. No. 94); Engility Mot. to Dismiss (Doc. No. 100-1); GLS Mot. to Dismiss (Doc. No. 104); Pl.'s Opp'n to Engility & GLS Mot. to Dismiss (Doc. No. 101); Engility Mot. to Dismiss Reply (Doc. No. 102); GLS Mot. to Dismiss Reply (Doc. No. 108).)

For the reasons that follow, the defendants motion to dismiss is granted in part, and denied only insofar as denying the motion to dismiss directed to Al-Kaysey's hostile work environment claim.  As that claim is the only remaining claim, Al-Kaysey's motion to amend is granted only insofar as it pleads a claim of hostile work environment, and his request to amend as to all other claims is denied as futile.

---

[3] "[I]ssues relating to subject matter jurisdiction may be raised at any time, even on appeal, and even by the court *sua sponte* . . . [and] [i]f a court perceives at any stage of the proceedings that it lacks subject matter jurisdiction, then it must take proper notice of the defect by dismissing the action."  *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (internal quotation marks and citations omitted).

[4] On September 22, 2015, the Court requested further factual development on the issue of subject matter jurisdiction and gave the parties time to submit supplemental briefing.  (9/22/15 Order (Doc. No. 111).)  The Army thereafter submitted a supplemental motion to dismiss with an accompanying declaration and exhibits, (Army Suppl. Mot. Dismiss (Doc. No. 114), after which Engility and GLS also submitted supplemental briefing in support of their motions, (GLS Supp. Mot. Dismiss (Doc. No. 118); Engility Supp. Mot. Dismiss (Doc. No. 119)).  (*See also* Pl.'s Supp. Opp'n (Doc. No. 117).)

## BACKGROUND[5]

Al-Kaysey is a naturalized United States citizen of Iraqi descent and a practicing Muslim. He was employed as a linguist by Engility from January 29, 2005 through August 2, 2010. During that time, Engility was contracted to provide linguistic services for the United States Army Special Forces. Al-Kaysey was stationed with the United States Army Special Forces at Camp Justice in Baghdad, Iraq, from April 2005 until July 2007, when he moved to Camp Tiffner, also in Baghdad. Al-Kaysey worked at Camp Justice with Operational Detachment Alpha ("ODA") 5223 and at Camp Tiffner with ODA 5224. In 2009, GLS took over Engility's contract with the Army and then subcontracted Engility.

In March 2010, Master Sergeant William Caskey and Staff Sergeant Daniel Clarke were also assigned to Camp Tiffner as members of the ODA 5224 Special Forces. Al-Kaysey claims that beginning in May 2010, Clarke and Caskey made repeated derogatory remarks to Al-Kaysey. In particular, Clarke called Al-Kaysey a "sand nigger," "camel jockey," "towel head," and "inferior" on multiple occasions, and Caskey said that he did not respect Al-Kaysey because Iraqis like him were "sand niggers," "monkeys," and "people with no pride." On another occasion, Caskey allegedly accused Al-Kaysey of having "low standards" because Al-Kaysey assisted an Iraqi national worker migrate to the United States.

Additionally, Al-Kaysey alleges that Clarke and Caskey made derogatory comments toward Muslims, Iraqis, and other non-Caucasians in Al-Kaysey's presence on multiple occasions. Clarke said he hated Iraqis and was afraid they would kill him or "rip[] [him] off,"

---

[5] The background of this action is taken from plaintiff's original *pro se* Complaint, as well as the proposed Amended Complaint, both of which are, in essence, the same as to the material facts and circumstances. As noted *infra*, the Court relies on materials outside of the pleadings submitted in connection with the defendants' motion to dismiss for lack of subject matter jurisdiction. The Court assumes the truth of all factual allegations contained in these pleadings and draws all reasonable inferences in plaintiff's favor. *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 300 (2d Cir. 2006).

and told Al-Kaysey that Islam was a "faith of violence" practiced by people who are "time bombs." Caskey told Al-Kaysey that Islam was a "waste of time" and a "religion of violence." Clarke and Caskey also called a Sudanese translator "nigger," "negro," and "colored," and referred to Iraqi officers as "monkeys," "towel heads," "sand niggers," and "camel jockeys."

Al-Kaysey claims that he voiced his opposition in response to some such comments. For example, when Clarke and Caskey complained to Al-Kaysey about a Shiite religious ceremony and used several of the same derogatory epithets already mentioned to refer to Iraqi civilians, Al-Kaysey objected, telling them to respect the civilians and be tolerant of their religious practices. And when Clarke and Caskey withheld pay, food, and water from Iraqi civilian employees, Al-Kaysey expressed sympathy for the Iraqis and objected to the conduct of Clarke and Caskey.

In early June 2010, Al-Kaysey received a call from an informant with whom he had previously worked at Camp Justice. This was the first contact between the two since Al-Kaysey was moved to Camp Tiffner. The informant had called to complain about compensation. Al-Kaysey asserts that he told the informant not to contact him again, and reported the call to his supervisors the same day, prompting Caskey to call a meeting. In that meeting, Caskey commended Al-Kaysey for properly reporting the incident and did not accuse him of any misconduct. Al-Kaysey then changed his phone number so the informant would be unable to contact him again, and claims to have had no further contact with the informant.

In mid-July 2010, Al-Kaysey submitted a vacation request to Jeff Payne, Engility's Site Administrator.[6] Payne, who was in regular contact with Clarke and Caskey, denied Al-Kaysey's vacation request and encouraged him to take medical leave instead, which would require Al-

---

[6] Although Al-Kaysey alleges that Payne is Engility's site administrator, Engility claims Payne is a GLS employee.

Kaysey to be "cleared" before returning.[7]  Caskey and Sergeant Alex McCoy, a member of ODA

5224 in charge of linguists, were scheduled to meet with Payne on July 30, and Al-Kaysey asked

to accompany them in order to speak to Payne about his vacation request.  Caskey declined, and

told Al-Kaysey that he and McCoy would "take care of it."  When they returned, McCoy told Al-

Kaysey that Engility had denied Al-Kaysey's request, and that he had to take medical leave if he

wanted time off.  On August 2, 2010, Al-Kaysey overheard Caskey asking whether Al-Kaysey

agreed to take medical leave, and upon hearing that Al-Kaysey did not do so, said, "let's do it,

[l]et's get rid of him."  That day, Lieutenant Daniel O'Connor issued an email recommendation

stating:

> It is imperative that [Al-Kaysey] be terminated with prejudice at the earliest
> opportunity.  This linguist should be considered a security risk and must not be re-
> hired, or allowed to retain a security clearance under any circumstances.

(Ex. L to Riley 11/16/15 Decl. ("Termination Recommendation & Approval") (Doc. No.

115-1) at 57.)  O'Connor's email further explained:

> After making initial contact with a suspected source target, linguist was told to
> cease and desist all further contact.  The linguist disobeyed this order, and
> continued communication with the source.  This was reported to the ODA by a
> secondary source, and confirmed when the ODA conducted a check on the initial
> source's cell phone; revealing between 500–600 calls within a 20 month period.
> It has also been suggested, but not verified, by the same third source that supplied
> the ODA with the information about the phone calls that the linguist may be
> interfacing with sources from other ODA's and/or sources who work with other
> U.S. Military units.

(*Id.*)

Shortly thereafter, Al-Kaysey was called into a meeting with Clarke, Caskey, and another

officer.[8]  There, Clarke accused Al-Kaysey of continuing to speak to the informant, and he and

---

[7] Al-Kaysey claims he had no medical issues.

[8] Al-Kaysey does not specify a date, but defendants all claim the meeting occurred on August 3, 2010.

Caskey terminated Al-Kaysey from his translation services assignment with the Army, allegedly saying they did not "expect much" from an "inferior" and a "sand nigger."  Al-Kaysey was not provided details, evidence, or any opportunity to respond to the allegations of unauthorized contact, nor was he asked any questions about them.  Al-Kaysey was then taken to the Baghdad airport where he claims he was held three days under constant surveillance.  His requests to speak to representatives from GLS and Engility were denied, and GLS did not provide him with a plane ticket to return to the United States.  Within a week, he was formally terminated by both Engility and GLS.[9]

In September 2010, Al-Kaysey learned that an incident report was filed in his Joint Personnel Adjudication System ("JPAS") account.[10]  The incident report consists of one paragraph stating that Al-Kaysey was terminated because he disobeyed orders by communicating with a source and that phone records revealed 500–600 calls between them within a twenty month period.[11]  Despite repeated attempts, Al-Kaysey was unable to get anyone to investigate or modify the incident report.  Though he maintains a security clearance, Al-Kaysey has been unable to obtain work as a Category III linguist.

---

[9] Al-Kaysey does not allege specific dates of termination by these defendants or even that they terminated him. However, it appears that Engility terminated Al-Kaysey on August 7, 2010, and GLS terminated him on August 3, 2010.  The fact that he was terminated by both GLS and Engility is integral to the Complaint and undisputed by all parties, and the Court will consider the fact of his termination by both companies for purposes of this motion.

[10] JPAS "is a confidential database in which the Department of Defense maintains information about the security clearances of its employees and contractors."  *Ravens Grp., Inc. v. United States*, 79 Fed. Cl. 100, 102 (2007). (*See also* Ex. M to Riley 11/16/15 Decl. ("Williams Decl.") (Doc. No. 115-1) at 60 (noting that when a contractor is debriefed from Sensitive Compartmented Information ("SCI") access for cause, an incident report is submitted to the Central Adjudication Facility ("CAF") via JPAS).)

[11] Al-Kaysey alleges that GLS filed the incident report, but Engility claims that it filed the incident report.

**STANDARDS OF REVIEW**

I.   12(b)(1)

Rule 12(b)(1) provides for dismissal of claims or complaints where the district court lacks the statutory or constitutional power to adjudicate them.  Fed. R. Civ. P. 12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A plaintiff carries the burden to affirmatively establish the existence of subject-matter jurisdiction by a preponderance of the evidence.  *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (quoting *Makarova*, 201 F.3d at 113).  In determining whether a court has subject matter jurisdiction, "the court may consider relevant documents that are extrinsic to the complaint."  *N.Y.S. Catholic Health Plan*, 321 F.R.D. at 294 (citing *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002)).  "After construing all ambiguities and drawing all inferences in a plaintiff's favor, a district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it."  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (internal citations and quotation marks omitted).

II.   12(b)(6) [12]

A court considering a Rule 12(b)(6) motion must "take[] factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor."  *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted).  To withstand a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[12] Some of the defendants move under Rule 12(c), while others move under Rule 12(b)(6).  However, the analysis does not change because "[t]he test for evaluating a [Rule] 12(c) motion is the same as that applicable to a motion to dismiss under [Rule] 12(b)(6)."  *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1995).

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  The determination whether "a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)).

## DISCUSSION

### I.    Subject-Matter Jurisdiction Over Al-Kaysey's Claims of Retaliation and Discrimination Related to his Removal and Termination

Defendants assert that the Court does not have subject-matter jurisdiction to hear Al-Kaysey's discrimination and retaliation claims – each of which requires a plaintiff to demonstrate an adverse employment action.  Here, defendants allege that the adverse employment actions – ordering Al-Kaysey's termination and "flagging" his JPAS account[13] – amount to predictive national security decisions not subject to judicial review under the doctrine set forth in *Department of Navy v. Egan*, 484 U.S. 518 (1988).  The Court agrees.

---

[13] The Court will assume, without deciding, that the filing of the JPAS account constitutes an adverse action, as it does not change the Court's conclusion or analysis.  And, of course, Al-Kaysey's termination would constitute an adverse employment action for purposes of Title VII.  However, none of the other alleged conduct on which Al-Kaysey relies constitutes an adverse employment action as they do not constitute a materially adverse change in the terms and conditions of employment.  *See Sethi v. Narod*, 12 F. Supp. 3d 505, 523 (E.D.N.Y. 2014) ("[A]n adverse employment action is a materially adverse change in the terms and conditions of employment. Such action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." (internal citation and quotation marks omitted)).  With respect to Engility, they include: (1) denial of his vacation request through Payne, who communicated to Al-Kaysey that he would have to take medical leave if he wanted time off, (Compl. ¶¶ 32–34); (2) refusal to provide Al-Kaysey with a copy of the JPAS incident report, (*id.* ¶ 46); and (3) declining Al-Kaysey's volunteer services in March of 2011 (*id.* ¶ 50).  With respect to GLS, they include: (1) holding him at the Baghdad airport for sixty hours; (2) denying his requests to speak to a human resources manager or Engility personnel; and (3) failing to provide him with a ticket back to the United States.  (*See id.* ¶¶ 17, 38–39.)  Moreover, he alleges that Engility delayed his promotion three years before the discrimination began (*see id.* ¶ 59), an action that had no causal connection to the alleged discrimination, and alleges that Engility rejected his volunteer services after his termination (*see id* ¶ 50), an action that post-dates the employment relationship and does not rise to the level of an adverse employment action.

A.   <u>Judicial Landscape</u>

The Supreme Court in *Egan* found the intrusion by courts or other judicial bodies into predictive judgments made by trained Executive personnel for the protection of national security prohibited.[14]  *Id*. at 529.  The Court explained that a predictive judgment is one that "attempt[s] to predict [an individual's] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information."  *Id.* at 528.  The Court further explained that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence."  *Id*. at 528–29; *see also Brazil v. U.S. Dep't of Navy*, 66 F.3d 193, 196 (9th Cir. 1995) ("At the core of *Egan's* deference to the national security mission is the recognition that security clearance determinations are 'sensitive and inherently discretionary' exercises, entrusted by law to the Executive.").  In other words, courts should not second-guess national security determinations made by the Executive Branch, due to "the long-recognized convention that the judiciary's institutional expertise is limited" in military and national security matters.  *Kaplan v. Conyers*, 733 F.3d 1148, 1156 (Fed. Cir. 2013) (citing *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)).

Courts have applied this reasoning in the context of Title VII and have found that *Egan* bars a court from analyzing a Title VII claim where the alleged adverse employment action implicates a national security determination.  To analyze a Title VII claim the Court must apply a burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under this analysis, plaintiff must first set forth a *prima facie* case of discrimination.  *Id.* The burden then shifts to defendant to demonstrate a legitimate non-discriminatory reason for the

---

[14] The *Egan* court addressed a merit board's review of the revocation of a security clearance.  As discussed below, courts have subsequently applied *Egan's* analysis in various contexts.

adverse employment action in question.  *Id.*  Finally, the burden shifts back to plaintiff to demonstrate that the reason set forth by defendant is pretextual.  *Id.; see also Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128–29 (2d Cir. 2012) (laying out framework).  In the national security context, courts cannot, given the institutional limitations described above, properly evaluate whether there is a legitimate, non-discriminatory reason for the alleged adverse employment action or whether such action is a pretext.[15]  *See Brazil*, 66 F.3d at 197 (rejecting review of security clearance determinations under Title VII because "[i]t is impossible for the court to . . . [determine] whether the Navy's proffered reasons were legitimate without evaluating their merits"); *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) (noting the "impossibility of proving pretext under Title VII without testing the merits of the Executive's decision" in security determination cases).

## B.  The Constitutional and Regulatory Landscape

The President is the "Commander in Chief of the Army and Navy of the United States" and has authority "to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to [information bearing on national security]."  *Egan*, 484 U.S. at 527.  "[U]nless Congress specifically provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  *Id.* at 530.  This case involves both.  Based on this constitutionally designated role, the judiciary must be particularly deferential to the Executive in cases involving the location at issue here – the theater of war.  *See id.*

There are several executive orders and regulations relevant to this action.  Executive Order ("EO") 12968, dated August 2, 1995, establishes "a uniform Federal personnel security

---

[15] As discussed *infra*, the Title VII national security exception further bolsters these principles.  *See* 42 U.S.C. § 2000e-2(g); *see also Toy v. Holder*, 714 F.3d 881, 886–87 (5th Cir. 2013).

program for employees who will be considered for initial or continued access to classified information" and requires that security policies designed to protect classified information "must ensure consistent, cost effective, and efficient protection of such classified information . . . while providing fair and equitable treatment to those Americans upon whom we rely to guard our national security."  (Ex. A to Riley 11/16/15 Decl. ("EO 12968") (Doc. No. 115-1) at 2.)  EO 12968's definition of "employee" expressly encompasses contractors.  (*Id.*)

Among the employee responsibilities listed in EO 12968 is the requirement to report "all contacts with persons, including foreign nationals, who seek in any way to obtain unauthorized access to classified information" and "to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security."  (*Id.* at 4, § 6.2 ¶¶ 1, 4(b).)  There is no "right" to a security clearance and such "clearance may be granted only when 'clearly consistent with the interests of the national security."  *Egan*, 484 U.S. at 528.  "Any doubt as to whether access to classified material is clearly consistent with national security" must be resolved in favor of protecting national security.  (Ex. C to Riley 11/16/15 Decl. ("DOD Directive 5220.6") (Doc. No. 115-1) at 12.)  Here, Al-Kaysey's access to the theater of war provided him access to classified information that implicated national security.  (*See* Ex. F to Riley 11/16/15 Decl. ("O'Connor Decl.") (Doc. No. 115-1) at 30 ¶ 11.)

DOD Directive 5220.6, or the DOD Personnel Security Program, implements EO 12968, (*See* DOD Directive 5520.6 at 7), and Army Regulation ("AR") 380-67, Personnel Security Program, in turn implements the DOD's personnel security policy for the Department of the Army.  (*See* Army's Supp. Mot. at 6; Ex. D to Riley 11/16/15 Decl. ("AR 380-67") (Doc. No. 115-1) at 14–19.)  Chapter 8 of AR 380-67 addresses "unfavorable administrative actions,"

defined as "any adverse action which is taken as a result of a personnel security determination."
(AR 380-67 at 15.)  It provides that, "[w]hen a commander learns of credible derogatory
information on a member of his or her command," the commander will immediately report the
information to a central clearance facility ("CCF") commander.  (AR 380-67 at 15, § 8-101(b).)
Paragraph 11-5 of AR 380-67 provides that a commander "must establish a security organization
for the command and appoint a formally trained security manager to track and manage
clearances in the unit."  (Army's Supp. Mot. at 6.)

　　　　Significantly, AR 380-67 provides that a commander or the head of an organization to
which the individual is assigned for duty "will not delay any contemplated personnel action
while awaiting final action by CCF."  (AR 380-67 at 15, § 8-101(b).)  The regulation further
provides that the commander or head of the organization "shall determine whether, on the basis
of all the facts available upon receipt of the initial derogatory information, it is in the interests of
national security to continue [the] subject's security status unchanged or to take interim action to
suspend [the] subject's access to classified information or assignment to sensitive duties . . . if
information exits which raises serious questions as to the individual's ability or intent to protect
classified information, until a final determination is made by the appropriate authority."[16]  (*Id.* at

---

[16] AR 380-67 does provide for procedural safeguards that appear not to have been implemented in Al-Kaysey's case.
(AR 380-67 at 15–16.)  However, Al-Kaysey has not alleged discrimination by the individuals responsible for
implementing that official process or motivating the failure to complete that process.  He suggests that Clarke and
Caskey acted with discriminatory animus in reporting his alleged conduct to O'Connor.  (*See* Comp. ¶¶ 5–7, 16.)
Based on AR 380-67, the action Al-Kaysey challenges here is an interim procedure, before the official process of
revoking an individual's security clearance, under which commanders and organization heads are permitted to
immediately remove a person they deem to be a risk to national security.  (AR 380-67 at 16, § 8-102.)  It is that step
that Al-Kaysey says was tainted by discrimination because it was taken at least in part based on Clarke and Caskey's
reports, and it is that step that this Court may not review under *Egan*.

The subsequent formal process is separately controlled by the central adjudication facility.  (*See* AR 380-67 at 15,
§ 8-101 ("[R]eferral of derogatory information to the commander or security officer shall in no way affect or limit
the responsibility of the central adjudication facility ["CAF"] to continue to process the individual for denial or
revocation of clearance or access to classified information . . . if such action is warranted. . . . No unfavorable
administrative action . . . may be taken by the organization to which the individual is assigned for duty without
affording the person the full range of protections contained in paragraph 8-201."); Ex. J to Riley 11/16/15 Decl.

16, § 8-102.)

Here, Al-Kaysey was a linguist assigned to ODA 5224.  O'Connor was the Unit Linguist Manager for that unit and a Force Protection Officer ("FPO").  (O'Connor Decl. at 26 ¶ 1; Ex. G to Riley 11/16/15 Decl. ("O'Connor Supp. Decl.") (Doc. No. 115-1) at 33 ¶ 2.)  The Army's contract with GLS expressly provides the Army the right to direct the removal of a contract employee "whenever . . . such action is warranted in the interest of national security . . . whether or not the cause is deemed of sufficient severity to warrant action to terminate [the employee's] security clearance."  (Ex. E to Riley 11/16/15 Decl. ("GLS & Army Contract") (Doc. No. 115-1) at 24.)  O'Connor recommended interim action – Al-Kaysey's immediate removal from the theater – to the Theater Linguist Manager for Iraq (the "TLM"), who agreed with his assessment. (*Id.* at 34–35 ¶ 4.)  Accordingly, O'Connor and the TLM took action that they were authorized to take pursuant to AR 380-67.

Furthermore, O'Connor testified in a sworn declaration that he was trained to make such judgments.  (O'Connor Decl. at 26 ¶ 1; O'Connor Supp. Decl. at 33 ¶ 2.)  He completed the Army's Anti-Terrorism and Force courses, Levels I and II, as well as the Anti-Terrorism and Force Program Manager course prior to being appointed the FPO, and  testified that he "was responsible for assessing personnel conduct that could pose threats to the safety, security, and operational success of the Special Forces detachments within the area of operations; and for making recommendations for handling such conduct, up to and including the removal of any

---

("DOD Manual") (Doc. No. 115-1) at 46 ("[O]nly the cognizant CAF can make a final determination regarding the individual's continued SCI eligibility.").)  There is no allegation in the complaint or amended complaint that anyone from the CAF, or even that O'Connor or the Iraq Theater Linguist Manager, acted with discriminatory animus or that the failure to provide the subsequent formal procedure was in any way motivated by discriminatory animus. (*See* Compl.; Am. Compl.)  Therefore, any formal process to which Al-Kaysey may have been entitled and which he may have been denied is not before this Court.  *See Bennett*, 425 F.3d at 1003 (finding that whether the agency "followed the proper procedures to deny or revoke [plaintiff's] security clearance is separate from the question of the effect of the [agency's] invocation of a security defense to [plaintiff's] Title VII complaint").

such threats to the unit." (O'Connor Decl. at 27 ¶ 1; O'Connor Supp. Decl. at 33 ¶ 2.) Thus, the decision to remove Al-Kaysey from the theater of war was a judgment implicating national security made by trained security personnel authorized to make such determinations.

C.   Application of *Egan* and its Progeny

The decision to remove Al-Kaysey from the theater of war is precisely the type of "predictive judgment" contemplated by *Egan*. O'Connor attests that he recommended that Al-Kaysey be removed from the Iraq Theater of Operations because, "[t]he fact that [Al-Kaysey] admitted to knowing the informer and appeared to be in close communication with him, coupled with the belief that this posed a serious security risk for SFOD-A 5224's ongoing military operations, led to a determination that Mr. Al-Kaysey was a serious security risk." (O'Connor Decl. at 29 ¶ 9.) On August 2, 2010, O'Connor sent an e-mail to the TLM recommending that the Army terminate its relationship with Al-Kaysey because Al-Kaysey posed a serious security risk. (*Id.* at 30 ¶ 10.) He further recommended that Al-Kaysey's access to classified information be suspended. (O'Connor Supp. Decl. at 35 ¶ 4.) The TLM agreed with O'Connor's assessment and recommendation and requested that O'Connor draft a memorandum containing the information he had reported. (*Id.*) The TLM could have disagreed with O'Connor's recommendations and directed that Al-Kaysey remain on staff or be re-assigned elsewhere within the Iraq Theater of Operations. (*Id.* ¶ 5.) Instead the TLM approved O'Connor's termination request, (Termination Recommendation & Approval at 57), and Al-Kaysey was removed from the theater and ultimately terminated.

O'Connor's recommendation and the TLM's ultimate decision that Al-Kaysey was a "security risk" and should be immediately removed from the theater of war, ("O'Connor Decl. at 29–30 ¶¶ 9–11; Termination Recommendation & Approval at 57), reflects precisely the sort of

"sensitive and inherently discretionary judgment call" about national security that Article II commits to the "broad discretion" of the responsible Executive Branch agency. *See Egan*, 484 U.S. at 527–29; *see also Ryan v. Reno*, 168 F.3d 520, 522 (D.C. Cir. 1999) (finding unreviewable a recommendation by a security agency director, which was approved by the INS personnel chief, not to grant a background investigation waiver). Though *Egan* arose in the context of a security clearance decision, courts have applied its reasoning to a variety of analogous predictive security judgments that similarly implicate the Executive Branch's expertise and constitutional authority to make critical decisions about national security. *See, e.g.*, *Foote v. Moniz (Foote II)*, 751 F.3d 656, 659 (D.C. Cir. 2014) (denying potential employee a Human Reliability Program certification necessary to obtain a position involving nuclear weapons); *Kaplan*, 733 F.3d at 1151–52, 1157 (indefinite suspension of employee occupying a "sensitive position" that did not require a security clearance); *Brazil*, 66 F.3d at 195 (revocation of civilian employee's Nuclear Weapons Personnel Reliability Program (PRP) certification). In fact, the Court of Appeals for the D.C. Circuit has expressly held that *Egan* is applicable even in cases in which the plaintiff's dismissal is not accompanied by the revocation of a security clearance. *Bennett*, 425 F.3d at 1001–03 (finding that agency correspondence and an affidavit indicating that plaintiff's termination was due to her inability to sustain a security clearance sufficed to show that she was terminated on the basis of a security determination, even though she retained a security clearance following termination).

Al-Kaysey attempts to focus the discussion on the existence and authenticity of the alleged phone calls, as well as on the lack of a formal revocation process. However, by downplaying the fact that the adverse employment action involved a predictive security judgment by the Army, Al-Kaysey attempts an end-run around *Egan* that must fail. *See Ryan*,

168 F.3d at 524 (rejecting appellants' "attempt to circumvent *Egan* by characterizing the challenged employment actions as procedural, divorced from any substantive security determination"). Focusing only on the existence of the calls takes too narrow of a view of O'Connor's and the TLM's decisions. O'Connor's recommendation, and the final action taken by the TLM, was to remove Al-Kaysey from the theater of war. Though past events and allegations may have informed that decision, the individuals responsible for linguists both in Al-Kaysey's unit and in Iraq ultimately made a forward-looking judgment: whether it was safe and in the interest of national security to permit Al-Kaysey to remain in the theater of war. *See Egan*, 484 U.S. at 528–29 (noting that a security clearance is an attempt to predict possible future behavior and "may be based, to be sure, upon past or present conduct"). (O'Connor Supp. Decl. at 34 ¶ 3.) This decision is prospective in nature. Further, it involved a determination by an Executive authority that it was counter to national security interests to permit Al-Kaysey to remain, as well as to have access to sensitive or classified information through his continued presence in the theater of war.[17] *See Ryan*, 168 F.3d at 524 (finding that the court lacked jurisdiction because review of a denial of a waiver in a security process was tantamount to a clearance denial). Thus, the officers' evaluation of the allegations concerning the phone calls cannot be separated from the merits of the ultimate security decision, and Al-Kaysey's argument challenging the existence of the calls, rather than the decision, amounts to an effort to circumvent *Egan*.

Courts have held that a court may not question the veracity of information underlying a national security decision. *See Panoke v. U.S. Army Military Police Brigade*, No. 05-CV-432 (JMS), 2007 WL 2790750, at *8 (D. Hi. Sept. 21, 2007) (finding that the court lacked

---

[17] Al-Kaysey's position required Top Secret and SCI clearance. (O'Connor Decl. ¶¶ 8–9.)

jurisdiction over a claim based on revocation of a security clearance where plaintiff claimed his supervisor "submitted information known to be spurious to the CCF for the purpose of retaliating against Plaintiff"), *aff'd* 307 F. App'x 54, 55 (9th Cir. 2009) (finding that "[a] review of the circumstances surrounding a security clearance is tantamount to a review of the security clearance's itself"); *Hill v. White*, 321 F.3d 1334, 1335–36 (11th Cir. 2003) (finding no jurisdiction to review initiation of security investigation where plaintiff alleged his supervisor "initiated disciplinary proceedings" for charges that "were false and frivolous and motivated by a desire to discriminate" because "[t]o review the initial stages of a security clearance determination is to review the basis of the determination itself regardless of how the issue is characterized"); *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996) ("The reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made. Thus if permitted to review the initial stage of a security clearance determination to ascertain whether it was a retaliatory act, the court would be required to review the very issues that the Supreme Court has held are non-reviewable.").[18]

Al-Kaysey relies on the D.C. Circuit's opinions in *Rattigan v. Holder*, asserting that a court may review instances in which a reporter knowingly provided false information in a security report or referral. *See Rattigan v. Holder* (*Rattigan I*), 643 F.3d 975, 989 (D.C. Cir. 2011), *limited by Rattigan v. Holder* (*Rattigan II*) 689 F.3d 764, 770 (D.C. Cir. 2012). However, the *Rattigan* cases are distinguishable as they "provide for judicial review only where the final

---

[18] This also provides a basis for denying Al-Kaysey's request for discovery. As the government correctly notes, "plaintiff admits to seeking discovery for the sole purpose of challenging the authenticity and validity of the Secretary's information related to plaintiff's telephonic communications between plaintiff and an Iraqi informer," further noting that those communications are classified and likely protected by the state-secrets privilege. (Army's Mot. to Dismiss Reply at 12 n.3.) The Court agrees with the government that "such discovery is precisely what *Egan* prohibits – an assessment of the validity of information related to the Executive Branch's security determination." (*Id.*) Even putting aside the classified nature of the information, which could be addressed under the Classified Information Procedures Act, *Egan* and its progeny as a legal matter prohibit the claim Al-Kaysey seeks to advance. As such, discovery regarding the underlying calls is not warranted.

security clearance determination was *favorable* to the plaintiff." *Tharp v. Lynch*, No. 15-CV-719, 2015 WL 84882747, at *9 (E.D. Va. Dec. 8, 2015); *see also Bland v. Johnson*, 66 F. Supp. 3d 69, 74–75 (D.D.C. 2014) (finding no jurisdiction to review a Title VII claim where plaintiff alleged management, not trained security personnel, requested that DHS reconsider plaintiff's security clearance and distinguishing *Rattigan* because there was no allegation of knowing falsity and the ultimate security decision was not favorable), *aff'd in relevant part*, 637 F. App'x 2 (D.C. Cir. 2016).[19]

The Army's ability to make decisions about who may or may not be in the theater of war with access to sensitive and classified information implicates national security and falls squarely within the spirit of *Egan*.   Conducting a Title VII analysis under the *McDonnell Douglas* burden-shifting framework would run "smack up against *Egan*," *Ryan*, 168 F.3d at 524, as it would require assessing both the government's legitimate non-discriminatory reasons for Al-Kaysey's termination, as well as Al-Kaysey's claim that those reasons were pretextual.  Thus, permitting Al-Kaysey's retaliation and discrimination claims to move forward would run afoul of precedent requiring courts to leave national security decisions to the discretion of the responsible Executive agency.  *See Foote v. Chu* (*Foote I*), 928 F. Supp. 2d 96, 101–02 (D.D.C. 2013); *Foote II*, 751 F.3d at 658 ("[T]he presumption in favor of judicial review of administrative action 'runs aground when it encounters concerns of national security.'" (quoting *Egan*, 484 U.S. at 527)).

For the reasons set forth above, *Egan* precludes judicial review of the Army's decision to immediately remove Al-Kaysey from Iraq and recommend his termination.

---

[19] The Court notes that there is a conflict in the district courts over whether the fact that the Security Division in the *Rattigan* cases determined that the reported information was unfounded is a dispositive factor in those cases.  At least one decision finds, contrary to the holdings in *Tharp* and *Bland*, that the reasoning in the *Rattigan* cases was not based on the fact that the Security Division ultimately reached a favorable determination.  *Burns-Ramirez v. Napolitano*, 962 F. Supp. 2d 253, 257 (D.D.C. 2013).  Upon review of the reasoning of the holdings in *Becerra*, *Hill*, and *Panoke*, however, the Court is persuaded that the favorable determination in *Rattigan* is significant.

D. *Egan* Applied to Engility & GLS

The Court is equally unable to review Engility's and GLS's decisions to terminate Al-Kaysey after the Army removed him from Iraq and ordered his termination.[20]  The *Egan* bar applies in the context of a private contract employer where the Title VII analysis would result in review of a predictive judgment implicating national security.  *See Beattie v. Boeing Co.*, 43 F.3d 559, 566 (10th Cir. 1994) (finding that the *Egan* rationale applies to a private employer where the employer's authority to grant or deny access clearance was derived solely from its contract with the Air Force).

On August 2, 2010, O'Connor wrote an e-mail to GLS indicating that it was "imperative that [Al-Kaysey] be terminated with prejudice at the earliest opportunity" because he posed a security threat.  (Termination Recommendation & Approval at 56–57.)  The following day, another e-mail was sent to GLS approving the termination recommendation, stating, "please terminate the employment of the above linguist ASAP."  (*Id.* at 57.)  O'Connor also notified Engility that Al-Kaysey had been designated a security risk and Al-Kaysey was subsequently "delivered to his employer for handling of the reported incident."  (O'Connor Decl. ¶ 10.)  GLS's contract with the Army provided that "[l]oss or suspension of required security clearance . . . would result in the contractor's inability to perform in accordance with the terms and conditions" of the contract and could subject the contractor to termination.  (GLS & Army Contract at 24.)  On August 3, 2010, GLS issued a termination memorandum recommending that Al-Kaysey be terminated based on the report received from the Army designating him a security

---

[20] Because the flag on Al-Kaysey's JPAS account was a direct result of the Army's determination that Al-Kaysey was a security risk, the Court also cannot review the JPAS flag without reviewing the merits of the underlying security determination.  "There is no discretion [for a contract employer] not to report, and a contractor's failure to report something that falls within the broad reach of 'adverse information' is not an exercise of discretion but a breach of the mandatory reporting obligation."  *Stephenson v. Nassif*, 160 F. Supp. 3d 884, 889 (E.D. Va. 2015).  Accordingly, the below analysis applies equally to Al-Kaysey's claim that defendants flagged his JPAS account.

risk.  (Compl., Ex. 18 at 85.)  On August 27, 2010, Engility sent Al-Kaysey a letter indicating that he had been terminated based on his security clearance.  (*Id.* at 86.)

Because Engility's and GLS's proffered reasons for terminating Al-Kaysey were based on the report from the Army that Al-Kaysey posed a risk to national security,[21] a review of their decisions, unfavorable to Al-Kaysey, would require the Court to wade into the same territory that *Egan* prohibits.  *See Clarke v. DynCorp Intern., LLC*, No. 12-CV-3267 (FM), 2014 WL 4269075, at *4 (D. Md. Aug. 28, 2014) (finding no subject matter jurisdiction in a Title VII action where a private employer's likely proffered nondiscriminatory rationale for termination would be the Executive branch's decision not to issue a security clearance).  Thus, for the same reasons discussed above, the Court does not have subject matter jurisdiction to review these claims.

Accordingly, the Court lacks jurisdiction over Al-Kaysey's claims of retaliation and discrimination as to all defendants.

### E.   National Security Exception to Title VII

As the Army correctly argues, the national security exception to Title VII provides an independent basis to dismiss Al-Kaysey's Title VII claims of discrimination and retaliation.  The provision states that, "it shall not be an unlawful employment practice . . . for an employer to discharge any individual from any position . . . if

> **(1)** the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and
>
> **(2)** such individual has not fulfilled or has ceased to fulfill that requirement.

---

[21] Al-Kaysey has plead no facts suggesting that Engility or GLS did not rely on the Army's security determination when terminating Al-Kaysey.

42 U.S.C. § 2000e-2(g).

In *Toy*, the Fifth Circuit held that the Title VII national security provision barred the suit of a contractor who was fired after the FBI revoked access to the FBI office where she had worked. 714 F.3d at 882, 886. The court construed the provision "broadly" as barring suit whenever employment or access is subject to "any set of regulations related to national security." *Id.* at 886. It found that EO 12829 establishes the National Industrial Security Program ("NISP"), which governs national security related to contractors and was therefore a "security program" for purposes of the provision. *Id.* The fact that the EO directed agencies to "control sensitive information" and "ensure that contracts abide by security regulations" was sufficient to show that the regulation related to national security. *Id.*

Here, Al-Kaysey's employment as a military contractor was subject to a number of security programs, including one analyzed in *Toy*. Specifically, GLS's contract with the Army required it to maintain a security program in accordance with the NISP Operating Manual. (*See* Complete GLS & Army Contract (Doc. No. 90-2) ¶ H.1(a); *see also id.* ¶ 2.1.2.3 (security procedures for Al-Kaysey's clearance were governed by the Department of the Army Policy on Counterintelligence and Security Support to Contract Linguist Acquisition dated April, 1998).) *Toy*, 714 F.3d at 886 (finding that NISP constitutes a security program for purposes of Title VII's national security provision).

As in *Toy*, Al-Kaysey was terminated after a security determination resulted in the denial of his access to a site containing sensitive and confidential information. *See Toy*, 714 F.3d at 886. His occupancy of his position and his right to be in the theater was subject to security program requirements imposed in the interest of national security. The Army determined that Al-Kaysey ceased to fulfill those requirements and accordingly removed him from the theater.

Accordingly, the national security provision bars Al-Kaysey's retaliation and discrimination claims. *See Cruz-Packer v. Chertoff*, 612 F. Supp. 2d 67, 70–71 (D.D.C. 2009) (considering the Title VII national security provision to pose the same question as *Egan*, and finding that plaintiff's claim was barred because plaintiff was arguing the merits of the security decision); *see also Davidson v. Lockheed Martin Energy Sys., Inc.*, No. 06-CV-45, 2007 WL 1231686 (TWP), at *8 (E.D. Ten. Apr. 26, 2007) (granting summary judgment to Title VII defendant in part because firing a government contractor for failure to maintain a security clearance cannot be an unlawful employment practice).

## II.   AL-KAYSEY'S MOTION TO AMEND

Defendants have moved to dismiss the original complaint under Rule 12(b)(6), while plaintiff has moved to amend his complaint and submitted a proposed amended complaint.[22]

When a party requests leave to amend his complaint, permission should generally be freely granted. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013); *City of New York v. Grp. Health, Inc.*, 649 F.3d 151, 157 (2d Cir. 2011) (stating that a party will be allowed to amend its complaint "unless the non-movant demonstrates prejudice or bad faith"); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.")  Further, leave to amend a *pro se* complaint should be granted "at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon*, 720 F.3d at 139 (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citations omitted)).  District courts need not grant leave, however, if amendment would be futile. *Forman v. Davis*, 371 U.S. 178, 182 (1962); *Reed v. Friedman Mgmt. Corp.*, 541 F. App'x 40, 41 (2d Cir. 2013).  In determining futility, the court should apply the same standard as in a

---

[22] Again, though GLS moves to dismiss under Rule 12(c) rather than 12(b)(6), the Court will refer to all defendants' motions as motions to dismiss.

motion to dismiss under Rule 12(b)(6).  *Dougherty*, 282 F.3d at 88 (stating that an "amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)"); *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 278 (E.D.N.Y. 2010).

A court considering a Rule 12(b)(6) motion must "take[] factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor."  *Harris*, 572 F.3d at 71 (citation omitted).  To withstand a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly* at 556).  The determination whether "a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007)).

Al-Kaysey filed his original complaint *pro se*, but is now represented by counsel.  His proposed amended complaint "removes non-actionable pleadings" and provides additional clarifying detail about his discrimination and retaliation claims.  (*See* Pl. Reply Supp. (Doc. No. 94) at 2–4.)  Defendants do not claim that the motion to amend is made in bad faith, nor that allowing it would prejudice them.

For the reasons stated above, any attempt by Al-Kaysey to amend his Title VII claims of discrimination and retaliation are barred by Egan and the national security exception to Title VII. Al-Kaysey's efforts to revive his due process claim also fail for the reasons set forth in *Al-*

*Kaysey II*.  However, for the reasons that follow, plaintiff's proposed amended complaint properly alleges a hostile work environment claim against all defendants, and is not futile.

A.  Al-Kaysey's Claim of a Hostile Work Environment

Al-Kaysey first alleges that defendants discriminated against him by creating a hostile work environment, which is prohibited by Title VII.  *See, e.g.*, *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2441 (2013).  In order to establish a hostile work environment claim, the plaintiff must show "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

The first prong requires that the work environment be objectively hostile and that Al-Kaysey subjectively perceive it as abusive.  *Id.* at 374.  Here, there can be no serious dispute that plaintiff perceived the work environment as abusive.  Objective hostility is determined from the perspective of a reasonable person in plaintiff's position.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004).  Five factors are considered: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.  *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).  The first two factors are the "principal focus of the analysis," though no factor is dispositive.  *Id.*

The conduct alleged here clearly qualifies as objectively hostile.  It is well-settled that "even a single act can meet the threshold [of severity and pervasiveness] if, by itself, it can and

does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374.  And "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."  *La Grande v. DeCrescente Distrib. Co., Inc.* 370 F. App'x 206, 210 (2d Cir. 2010).  Al-Kaysey alleges that he was exposed to repeated slurs, epithets, and derogatory comments about Muslims, Iraqis, and others starting in March 2010 when Clarke and Caskey were assigned to ODA 5224, and that the comments were directed specifically at Al-Kaysey from May 2010 until his termination in August 2010.  (Am. Compl. ¶¶ 12–13, 15, 17–19, 22–24, 34, 42.)  The comments included, but were not limited to, calling Al-Kaysey a "sand nigger," "camel jockey," "towel head," and "monkey."  (*See id.* ¶¶ 12, 18, 42.)  Al-Kaysey's supervisors used similar epithets to refer to Iraqi civilians and Iraqi Army Officers (Al-Kaysey is a United States citizen of Iraqi descent), as well as a Sudanese translator, all in plaintiff's presence.  (*See id.* ¶¶ 18, 22–24.)  They also referred to Islam (Al-Kaysey is a practicing Muslim) as a violent religion and a waste of time, and said it is practiced by people who are "time bombs."  (*See id.* ¶¶ 15, 17.)  The amended complaint further states that the examples given are not exhaustive, and that the comments were directed at Al-Kaysey and at others in Al-Kaysey's presence.  These comments as alleged clearly constitute a pattern of conduct that occurred in a variety of contexts toward people in various roles, and not simply a few isolated incidents.  Furthermore, Al-Kaysey has alleged that he suffered emotional distress and harm as a result of the harassment.  (*See id.* ¶¶ 26, 60.)  The alleged conduct is therefore frequent, unambiguously discriminatory, and humiliating, and it easily constitutes objective hostility.

The alleged discriminatory comments were made by Army personnel that occupied a supervisory role with respect to Al-Kaysey.  Where the harassing employees are supervisors of a plaintiff, an employer may be held vicariously liable for the supervisors' creation of a hostile work environment.  *See Vance*, 133 S. Ct. at 2441.  "An employee is a supervisor for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 2454.  Al-Kaysey alleges that Clarke and Caskey terminated him at the August 3 meeting, telling him he was "not needed" and to pack his bags. (Am. Compl. at ¶ 42.)  This shows that they had the authority to take employment actions against him, and the Army may therefore be held liable for their alleged discriminatory conduct.[23] *See Vance*, 133 S.Ct. at 2448–50.

Although Al-Kaysey was not directly employed by the Army, as the Court held in its previous Order, [Engility] and/or GLS – were actually dictated by the Army." *See Al-Kaysey I*, 2013 WL 5447686 at *23–24.  Those same facts are alleged in the amended complaint.  Given that Al-Kaysey alleges that Army personnel made the comments in the presence of Army commanders and that the Army knew or should have known about their discriminatory conduct, Al-Kaysey has plausibly alleged the Army's liability under a joint-employer theory as well.  Al-Kaysey has therefore demonstrated a specific basis for imputing the objectionable conduct to the Army.

Construing Al-Kaysey's original complaint liberally because of his *pro se* status, this Court previously found that Al-Kaysey adequately alleged a Title VII claim against Engility and

---

[23] Even if Clarke and Caskey did not qualify as plaintiff's supervisors, plaintiff also alleges that numerous derogatory remarks were made in front of Army commanders, (*see* Am. Compl. ¶ 28), making it plausible that the Army "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Dutch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009).  Thus even if Clarke and Caskey were deemed co-workers rather than supervisors, Al-Kaysey has sufficiently alleged the negligence required to establish the Army's vicarious liability for their behavior.  *See Vance*, 133 S.Ct. at 2441; *Dutch*, 588 F.3d at 762.

GLS. *See Al-Kaysey II*, 2013 WL 5447830 at *4–6.  The Court read Al-Kaysey's original

complaint to allege that GLS, Engility, and the Army were joint employers, and he continues to

alleged that he was "jointly employed by Engility, GLS, and the Army."  (*See e.g.*, Am. Compl.

at ¶¶ 7, 38.)[24]  As discussed in *Al-Kaysey I*, the joint employer test requires that the Court

determine, *inter alia*, "whether an entity possessed sufficient indicia of control to be considered a

joint employer," further noting that this determination "is essentially a factual issue."  2013 WL

5447686 at *23–24.  For these same reasons, the Court finds that with respect to Al-Kaysey's

hostile work environment claim, the joint employer relationship between the defendant entities

and thus the liability, if any, of the Army, GLS and L-3 are not susceptible to resolution on this

motion.  As such, Al-Kaysey's motion to amend to persist in his claim of hostile work

environment as to all three defendants is granted.[25]

## B.  Al-Kaysey's Fifth Amendment Due Process Claims

In addition to the Title VII claims, Al-Kaysey attempts to revive his due process claims.

These claims weret previously dismissed because Al-Kaysey "failed to allege a cognizable

constitutional deprivation."  *Al-Kaysey II*, 2013 WL 5447830 at *4.  Al-Kaysey now concedes

that, consistent with this Court's opinion in *Al-Kaysey II*, he cannot establish the deprivation of a

property interest.  However, he maintains that he has been deprived of a liberty interest – "his

right to pursue his career as a military linguist."  (*See* Pl.'s Opp'n to Army & Mot. to Am. at 22.)

---

[24] There are two paragraphs labeled (7) in the Amended Complaint – this paragraph appears on page 2.

[25] As the government notes, however, to the extent that Al-Kaysey seeks to assert that the unfavorable security determination or termination constitutes an alteration to the conditions of his employment resulting from any hostile work environment, this aspect of Al-Kaysey's claim fails for lack of jurisdiction under *Egan* and its progeny as discussed above.  *See Wyerr v. Hagel*, No. 12-CV-1261, 2013 WL 2467997 (S.D. Ind. June 7, 2013) (dismissing plaintiff's claim that an investigation of her ability to hold a non-critical sensitive position created a hostile work environment as nonjusiticiable under *Egan*).

Al-Kaysey argues that the flagging of his JPAS report injured his reputation and has prevented him from securing employment as a military translator.  (*See id.*)

As discussed in *Al-Kaysey II*, this allegation could arguably give rise to a "stigma-plus" claim under the Due Process Clause.  In order to plead such a claim, Al-Kaysey must allege that (1) the government made stigmatizing statements about him; (2) the purportedly false statements were made public; and (3) the statements were made concurrently with plaintiff's termination. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004).  Al-Kaysey has alleged no new facts regarding the public availability of the stigmatizing statements that alter the Court's earlier analysis – the availability of the JPAS incident report to other government contractors still forms the basis of his argument.  (*See* Pl. Reply Supp. at 8.)  As this Court previously held, this does not qualify as a stigmatizing statement that was made public.  *See Al-Kaysey II*, 2013 WL 5447830, at *9–10.  Al-Kaysey offers no "cogent or compelling" reason for the Court to now find otherwise.  *In re Nassau Cnty. Strip Search Cases*, 958 F. Supp. 2d 339, 343 (E.D.N.Y. 2013) (citing *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996), *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir. 1991)).  Al-Kaysey's motion to amend is thus denied as futile with respect to his Fifth Amendment Due Process claim.[26]

## CONCLUSION

For the reasons stated in this Memorandum and Order, Al-Kaysey's claims of discrimination and retaliation are dismissed for lack of subject matter jurisdiction as against the Army, Engility and GLS.  Al-Kaysey's claim of hostile work environment as against the Army,

---

[26] Al-Kaysey also asks for leave to move for sanctions against Engility and GLS for their "frivolous and duplicative motions to dismiss."  (Pl.'s Opp'n to Engility & GLS Mot. to Dismiss at 11.)  Al-Kaysey objects to the motions because Engility and GLS did not submit letters renewing their requests for extensions to file the motions.  But at the conference on March 13, 2014, the Court stated that the parties could file the contemplated motions as they saw fit.  (*See* 3/13/14 Transcript at 45.)

Engility and GLS shall proceed, and Al-Kaysey's motion to amend is granted only insofar as the Amended Complaint pleads a claim of hostile work environment.

This matter is committed to the assigned Magistrate Judge for supervision of all pre-trial matters on the remaining claim.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated:  Brooklyn, New York
        September 23, 2016

_____
ROSLYNN R. MAUSKOPF
United States District Judge